[No. E017776. Fourth Dist., Div. Two. July 23, 1997.]

THE PEOPLE ex rel. DANIEL E. LUNGREN as Attorney General, etc., Plaintiff and Appellant, v.
COMMUNITY REDEVELOPMENT AGENCY FOR THE CITY OF PALM SPRINGS, Defendant and Respondent.

## COUNSEL

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Manuel M. Medeiros and Sara J. Drake, Deputy Attorneys General, for Plaintiff and Appellant.

Rutan & Tucker, David J. Aleshire, William W. Wynder and David B. Cosgrove for Defendant and Respondent.

## OPINION

**RAMIREZ, P. J.**—The Attorney General, plaintiff below, appeals from the judgment dismissing his complaint against the Community Redevelopment Agency for the City of Palm Springs (Agency). In his complaint the Attorney General challenged the actions of the Agency in entering into a contract with the Agua Caliente Band of Cahuilla Indians (Tribe) under which the Agency would transfer real property owned or acquired by it to the Tribe for use in the Tribe's gaming operations, and in exchange the Tribe would give the Agency a share of the gambling proceeds. The trial court found that the Tribe was an indispensable party to the action but could not be joined because of its sovereign immunity, and on the Agency's motion the court dismissed the complaint. We conclude that the Tribe was not an indispensable party to the action and we reverse.

### FACTS

In October 1994 the Agency and the Tribe[1] entered into a disposition and development agreement (DDA)[2] outlining the development of a gaming casino on 10.3 acres of property located in the City of Palm Springs (City). Under the DDA the Tribe would acquire from its Indian owners several parcels of real property located in downtown City, and the Tribe would purchase several other adjacent parcels of property from the Agency for $1.9 million. The Tribe would then construct a gaming casino on the property. The Agency would take the $1.9 million proceeds from the sale of the two parcels and use it to purchase two other parcels (or, if necessary, would acquire them by eminent domain) which would then be conveyed to the Tribe for no consideration to be used for parking and "to create access and

---

[1]Also party to the agreement was the Agua Caliente Transfer Corporation (Transfer Corporation), a California corporation formed at the direction of the Tribe but holding none of the incidents of sovereign immunity.

[2]By request for judicial notice filed November 18, 1996, the Agency has asked this court to take judicial notice of the DDA and its attachments. We hereby grant that request.

visibility of the Project to the major arterial, Indian Canyon." Any balance of the $1.9 million was to be used "to benefit the Project in a manner mutually agreed to by the parties."

The DDA provided that if the Tribe failed to construct the casino before the Agency was ready to transfer the additional parcels, the Agency was to keep the proceeds of the original sale; if construction was delayed, protections were included which would have given the Agency the ability to have the second set of properties returned. The DDA specifically provided that the Agency would have the right to repurchase the second-acquired parcels in the event completion of construction on the first acquired parcels was not timely. The DDA detailed the requirements for the escrows on the various properties, and concluded that title to the second-acquired parcels was to be conveyed "to the Tribe or to the United States of America in trust for the Tribe" following issuance of the certificate of completion of that portion of the project to be constructed on the second-acquired parcels.

In the DDA the parties acknowledged that the Agency and the Tribe[3] had entered into a memorandum of understanding (MOU) and the DDA "with the expectation that (a) the Site would be improved and used for a gaming casino for Class II gaming or, if permitted by law, Class III gaming or similar activity to the full extent permitted by applicable federal law; (b) that such use would provide substantial economic benefit to the City, including, without limitation, an increase in sales and other taxes payable to the City from the Project and from the growth of additional business within the City supported by increased tourism; and (c) the City would be entitled to the 'Mitigation Fee' defined in the MOU to cover the added expenses to be incurred by the City to provide City services necessitated by reason of use of the Site for gaming purposes." The agreement provided that in the event the Tribe was to determine, before the expiration of 15 years, that use of the property as a casino was not economically or otherwise feasible, the Tribe was to meet with the Agency to determine what compensation was to be received by the City. The agreement outlined the terms for such negotiations.

---

[3]The DDA uses the term "Developer" which is used to mean the Tribe as to the first-acquired parcels and the Transfer Corporation as to the second-acquired parcels. The Transfer Corporation was made a party to the DDA and was made the original grantee of the second-acquired parcels because it was not entitled to sovereign immunity.

The MOU,[4] which was signed in March 1994, stated that the Tribe had chosen Caesars World, Inc., to be the manager and operator of the casino. The MOU went on to state that the participation formula, called in the DDA the "Mitigation Fee," to be paid to the City was to be based on the "Casino Win" of the casino. The casino win was to be calculated by starting with gross revenue from all gaming, and subtracting from that all prize payouts for gaming wins by customers, bad debt from customer gaming, and promotional discounts and allowances, i.e., "all incentives in cash or in kind provided to casino customers to promote and encourage gaming at the Site."

If the casino win in any year was $18,555,000 or less, the City was to receive nothing; if the casino win was between $18,555,001 and $28,555,000, the City was to receive 3 percent; if the casino win was over $28,555,000, the City was to receive 2 percent. The payments were to be made annually. The estimated cost of building the 80,000-square-foot gaming casino was stated in the MOU to be $25 million for land and improvements, and construction was to start within 4 years of the signing of the MOU.

Under the Indian Gaming Regulatory Act of 1988, the Tribe could only engage in class III gaming[5] pursuant to a compact with the state. According to the recitals of fact in the MOU, a compact to address the question of class III gaming was being negotiated between the Tribe and the state at the time the MOU was prepared. Under a draft of the compact, such issues as environmental impact and construction and safety standards were subject to agreement between the Tribe and the affected local jurisdictions, and a major purpose of the MOU was to provide the required agreement between the Tribe and the City on those issues.

The Agency passed a resolution in September 1994 approving the DDA. The DDA was signed by all the parties in October 1994. In November 1994

---

[4] A copy of the MOU was attached to the complaint in another suit that was filed against the Agency seeking to enjoin the carrying out of the DDA; that suit has now come before this court on appeal following grant of defendant's motion to dismiss. (*Ebling* v. *Community Redevelopment Agency* (E015608, app. pending).)

[5] Class III gaming is defined in the Indian Gaming Regulatory Act as "all forms of gaming that are not class I gaming or class II gaming." (25 U.S.C. § 2703(8).)

Class I gaming includes generally "social games solely for prizes of minimal value . . . ." (25 U.S.C. § 2703(6).)

Class II gaming is defined to include bingo and card games that "are not explicitly prohibited by the laws of the State," but does not include "any banking card games, including baccarat, chemin de fer, or blackjack," and also does not include "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." (25 U.S.C. § 2703(7).)

the People ex rel. Daniel E. Lungren as Attorney General filed a complaint against the Agency, the Tribe and the Transfer Corporation.

The complaint sought a declaration that any conveyance of lands by the Agency to the Tribe or the Transfer Corporation pursuant to the DDA was subject to an implied reservation by the state of exclusive and complete civil and criminal jurisdiction; for a declaration that the Agency had no power "to surrender, impair, or embarrass the State's exclusive, sovereign civil or criminal jurisdiction over land, including the State's jurisdiction to prohibit or regulate gambling on such land"; for a declaration that the DDA was void to the extent that it purported to dispose of issues related to the conduct of class III gambling in the state; for a declaration that the DDA was void as inconsistent with section 19, subdivision (e), of article IV of the California Constitution; and for a preliminary injunction prohibiting the Agency from conveying to the Tribe title to any property to be used in connection with any gambling operation that is prohibited under the laws of the State of California "except to the extent that such a conveyance is expressly permitted by statute or by an approved tribal-state compact."

Following the filing of the complaint the Tribe filed a motion to quash service of summons on the ground that the Tribe possessed sovereign immunity from unconsented suit, which immunity had not been waived by the Tribe. The Agency filed its own motion at that time demurring to the complaint and seeking dismissal of the complaint on the ground that the Attorney General could not join the Tribe because of the Tribe's sovereign immunity, and that since the Tribe was a party indispensable to the proper adjudication of the case the court was compelled to dismiss the entire action.

The parties submitted briefing on these issues. The Agency also submitted to the court a copy of the trial court ruling dated November 7, 1994, in Ebling v. Community Redevelopment Agency (Super. Ct. Riverside County, No. 078004), an action brought by private citizens challenging the DDA, in which the trial court had granted the Agency's motion to dismiss the complaint on the ground, among others, that the Tribe was an indispensable party. The Agency submitted the ruling to demonstrate the potential for inconsistent liabilities on the part of the Agency should the court allow the matter before it to proceed.

A brief hearing was held at which counsel argued the motions. Persuaded by the Agency's position, the court on January 3, 1995, granted the Agency's motion to dismiss. In its discussion of the ruling the court emphasized its reliance on a finding that the Tribe met the criteria set forth in Code of

Civil Procedure section 389 (sometimes, section 389) as applicable to a necessary party. The court cited both California and federal authority in support of its conclusion that the Tribe was an indispensable party, and that inability to join the Tribe therefore required dismissal of the action.[6] Judgment was entered dismissing the Attorney General's complaint and this appeal followed.

DISCUSSION

## I. Code of Civil Procedure Section 389

Subdivisions (a) and (b) of Code of Civil Procedure section 389 provide as follows: "(a) A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party.

"(b) If a person as described in paragraph (1) or (2) of subdivision (a) cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable. The factors to be considered by the court include: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder."

Section 389 was revised in 1971, and the revision substituted "practically in its entirety rule 19 of the Federal Rules of Civil Procedure" for the former section. (Cal. Law Revision Com. com., 14 West's Ann. Code Civ. Proc. (1973 ed.) § 389, p. 221.) "This section, as adopted in 1971, limits compulsory joinder to those situations where the absence of a person may result in

---

[6]The ruling granting the Tribe's motion to quash because of the Tribe's sovereign immunity is not included in the record on appeal, but no appeal has been taken from that judgment.

substantial prejudice to that person or to the parties already before the court. [Citations.] As revised, this section conforms substantially to rule 19 of the Federal Rules of Civil Procedure and the cases relating to the federal rule are relevant." (*Copley* v. *Copley* (1981) 126 Cal.App.3d 248, 296 [178 Cal.Rptr. 842].)

## II. *Standard of Review*

 The standard of review on appeal from a judgment under Code of Civil Procedure section 389 would appear to be the same as under the federal rule; that standard has been stated as follows by a federal appellate court: "We review a district court's decision under Rule 19 for an abuse of discretion. [Citations.] To the extent that the district court's determination whether a party's interest is impaired involves a question of law, we review de novo. [Citation.]" (*Pit River Home and Agr. Co-Op Ass'n* v. *U.S.* (9th Cir. 1994) 30 F.3d 1088, 1098.) We will apply that standard to the present case.

## III. *Application of Code of Civil Procedure Section 389*

In its comments to the 1971 amendments of section 389 the Law Revision Commission noted that under the revised statute ". . . a person is regarded as indispensable only in the conclusory sense that in his absence, the court has decided the action should be dismissed. Where the decision is to proceed the court has the power to make a legally binding adjudication between the parties properly before it.

"Section 389 formerly attempted not only to avoid prejudice to the parties or absent person but also to promote the general convenience of the courts by preventing a multiplicity of suits. As revised, Section 389 takes a different approach; it limits compulsory joinder to those situations where the absence of a person may result in substantial prejudice to that person or to the parties already before the court." (Cal. Law Revision Com. com., 14 West's Ann. Code Civ. Proc., *supra*, § 389, p. 222.)

Courts interpreting the amended section have acknowledged the purposes to be served by the amended section. Thus, for example, a frequently cited decision interpreting the amended statute stated that "as under federal rule 19, failure to join a party who may be regarded as 'indispensable' is not, under section 389, a jurisdictional defect in the technical sense. Although the court has no jurisdiction of the absent party, and its judgment cannot bind him, the court does have jurisdiction of the existing parties and it has the power to make a judgment affecting their interests. It is for discretionary and equitable reasons, not for any want of jurisdiction, that the court may decline

to proceed without the absent party. [Citations.]" (*Kraus* v. *Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 368 [140 Cal.Rptr. 744], fn. omitted; accord, *Sierra Club, Inc.* v. *California Coastal Com.* (1979) 95 Cal.App.3d 495, 500 [157 Cal.Rptr. 190].)

In *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893], a challenge by a citizens group to the action of the county board of supervisors in approving development plans for a proposed shopping center, this court rejected a claim that the owner of the real property at issue was an indispensable party whose absence required dismissal of the action. Noting that the owner of the property would have been a proper real party in interest, we held that the owner was not a necessary party because his interests were adequately represented by the developers who had an option to purchase the subject property. (*Id.*, at p. 161.)

This court then went on to observe: "Even if the owner of the subject property was impaired in his ability to protect that interest, the owner was not indispensable. The Supreme Court provided guidance in this regard when it cautioned against the common blunder of finding any necessary party as indispensable and observed that '. . . we should . . . be careful to avoid converting a discretionary power or a rule of fairness in procedure into an arbitrary and burdensome requirement which may thwart rather than accomplish justice.' (*Bank of California* v. *Superior Court* (1940) 16 Cal.2d 516, 521 . . . ; see *Kraus* v. *Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 368-369. . . .)" (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo*, supra, 172 Cal.App.3d at p. 162.)

A. *Section 389, Subdivision (a)*

Against that background we examine the elements of section 389 to determine their application. Section 389 first requires that "A person . . . shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties . . . ." This does not appear to be an issue in the present case; resolution of the issues before the court would give complete satisfaction to the parties presently before the court. A court determination that the Agency had the authority to enter into the DDA would allow the project to proceed as the Agency wishes; a determination that the Agency had no such power would stop the project as sought by the Attorney General. This is not a case, for example, in which a party not before the court owns some unspecified interest in property which precludes a final determination of the interests held in that property by those who do

appear as parties. (See, e.g., *Wichita and Affiliated Tribes of Oklahoma* v. *Hodel* (D.C. Cir. 1986) 788 F.2d 765, 774-778 [252 App.D.C. 140] [challenge by one of three tribes seeking retroactive allocation of income of land held in trust by United States for all three tribes; claim dismissed upon inability to join other two tribes, since they were beneficiaries of the trust who stood to lose if plaintiff prevailed].)

Section 389 next requires that a person be joined if "he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

It cannot be doubted that the Tribe can claim an interest relating to the subject of the action. The project in which the Tribe has a substantial interest will either proceed or not proceed depending on the outcome of the suit. It is less clear, however, that the absence of the Tribe in the present action will, as a practical matter, impair or impede the Tribe's ability to protect its interests. The issue raised in the present case is the legality of the Agency's actions in agreeing to relinquish City-owned property and placing it beyond the reach of the civil and criminal jurisdiction of the state. The actions of the Tribe in entering into the DDA are not challenged. The Tribe's ability to look after its own interests in this setting would be limited to the opportunity to argue that the Agency's actions were permitted by California law. It would thus appear that, although the Tribe and the Agency have interests under the DDA that are not identical, the Tribe's object in the present litigation—establishing that the Agency acted lawfully in entering into the DDA—would duplicate that of the Agency and would be adequately represented by the Agency in the present litigation.

There is authority, however, stating that a party to a contract is always an indispensable party to a suit to set aside that contract. Thus, it has been stated that " '[n]o procedural principle is more deeply embedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable.' [Citations.]" (*Jicarilla Apache Tribe* v. *Hodel* (10th Cir. 1987) 821 F.2d 537, 540; see also *U.S.* ex rel. *Hall* v. *Tribal Development Corp.* (1996) 100 F.3d 476, 479, and cases cited therein.)

The effect of this as a firm rule in determining whether to dismiss would be to eliminate the exercise of discretion accorded to the trial court under

Code of Civil Procedure section 389, subdivision (b), and rule 19(b) of the Federal Rules of Civil Procedure (28 U.S.C.). The mere fact of participation in a contract would render a party indispensable. In the cases citing this as a truism, however, the impact of the action on the absent parties is such that they are indeed required for an adequate resolution of the case. Thus, in *Jicarilla Apache Tribe* v. *Hodel, supra,* 821 F.2d 537, a petroleum company filed a motion to intervene in a suit brought by a tribe to determine the value of certain oil and gas leases; the company then filed an independent suit against the Secretary of the Interior seeking to make additional payments in order to preserve its interest in those leases. The court determined that the tribe was an indispensable party to a suit to alter the terms of the agreement to which the tribe was a party, and dismissed the action. (*Id.,* at p. 540.) In fact, the suit was not to set aside the contract, but rather to enforce it against the Tribe under different terms.

*U.S.* ex rel. *Hall* v. *Tribal Development Corp., supra,* 100 F.3d 476, involved a *qui tam* action brought by individuals against a number of merchants who supplied Indian tribes with goods and services for their gaming operations. The challenge was to the terms of the sale and lease contracts, including claims that the terms violated federal statutes. Although *Hall* bears similarities to the case before us, it differs in its basic focus. As stated by the appellate court in *Hall,* plaintiffs there "seek to void contracts between the defendants and the Tribe for the leasing of goods and services that the Tribe needs in order to operate its casinos." (*Id.,* at p. 480.) The purpose of the suit was to frustrate the gaming operations of the tribe. While that may be an incidental purpose of the suit before us, the central challenge is to the authority of the Agency to give or sell city property to the Tribe for gaming operations; the suit does not seek to inhibit the Tribe's ability to act on property it already owns.

A more extreme statement of the circumstances that require dismissal of an action for inability to join an absent party is presented in *Enterprise Mgt. Consultants* v. *U.S.* ex rel. *Hodel* (10th Cir. 1989) 883 F.2d 890. In that case, a company whose bingo management contract with a tribe was not approved by federal officials filed suit against the tribe and the federal officials seeking review of that administrative action. The appellate court dismissed the action for lack of an indispensable party. (*Id.,* at p. 892.) The court in *Enterprise Mgt. Consultants* first cited the decisions that require dismissal for failure to join a party to a contract in an action to set aside that contract. (*Id.,* at p. 894.) The court went on to extend that holding and to recommend dismissal of actions in which a party to the contract can claim sovereign immunity, concluding that "In addition to the effect this action would have

on the Tribe's interest in the contract, the suit would also effectively abrogate the Tribe's sovereign immunity by adjudicating its interest in that contract without consent." (*Ibid.*)

Were we to choose to follow these decisions the case before us would be resolved. ■ The action in the present case is an action to set aside a contract to which the Tribe is a party. To the extent a decision setting aside the contract in the present case adjudicates the interests of the Tribe in the contract, such a decision would "effectively abrogate the Tribe's sovereign immunity." As we have discussed, however, a ruling in the present case would primarily address the scope of the Agency's authority and only incidentally would adjudicate the interests of the Tribe in the contract. "At the threshold, tribal immunity does not extend to barring suit against a third, non-immune party solely because the effect of a judgment against the third party will be felt by the tribe." (*Wichita and Affiliated Tribes of Oklahoma* v. *Hodel, supra,* 788 F.2d at p. 771.)

Furthermore, the rule advocated in *Enterprise Mgt. Consultants* could easily have been included in the language of section 389, but it was not. Rather than stating that sovereign immunity was intended to carry with it a broad cloak of immunity to all who have dealings with the sovereign, section 389 provides for a balancing of the interests at stake in the individual case and a determination how the case should, "in equity and good conscience," be resolved. Thus, rather than stopping our analysis here we conclude that under cases interpreting the joinder requirements, the Tribe in the present case is a proper party to be joined in the suit, and is therefore a "necessary" party under subdivision (a) of section 389. We next move on to examine, under subdivision (b) of section 389, whether the Tribe is also indispensable.[7]

## B. *Section 389, Subdivision (b)*

It is under subdivision (b) of section 389 that a court must decide whether a party is truly indispensable; if a party is found, under subdivision (a), to be necessary to the action but cannot be made a party, the court "shall determine whether in equity and good conscience the action should proceed

[7]Addressing the final element of subdivision (a) of section 389, we consider whether a decision made in the Tribe's absence would leave any of the parties subject to inconsistent obligations because of the Tribe's claimed interest. Although this has been raised by the Agency as a serious threat, and was raised too at the hearing in the trial court on the motion to dismiss, we do not believe that it poses a serious risk. Should the DDA be struck down as having exceeded the authority of the Agency, the Agency would have a defense of legal impossibility to any enforcement action brought by the Tribe. As a practical matter it appears from the record that any action to enforce the DDA would be unlikely because the Tribe would simply build its casino on other land.

among the parties before it" or whether the action should be dismissed, "the absent person being thus regarded as indispensable." In making this determination the court should consider the four factors listed in the statute.

### 1. *Prejudice*

The first factor is "to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties." This is essentially the same assessment that must be made under subdivision (a) in determining whether a party's absence would impair or impede that party's ability to protect his or her interests, and determining whether proceeding to judgment would subject existing parties to inconsistent obligations. (See, e.g., *Pit River Home and Agr. Co-Op Ass'n* v. *U.S., supra,* 30 F.3d at p. 1101 ["prejudice stems from the same legal interests making someone a necessary party to the action"]; accord, *Enterprise Mgt. Consultants* v. *U.S.* ex rel. *Hodel, supra,* 883 F.2d at p. 894, fn. 4.) This factor also appears to carry great weight with the courts that have considered the question of indispensable parties.

In *Sierra Club, Inc.* v. *California Coastal Com., supra,* 95 Cal.App.3d 495, the court acknowledged that the absence of an indispensable party did not deprive the court of jurisdiction, but the court nonetheless concluded that dismissal of the action was appropriate. (*Id.,* at p. 502.) In that case, plaintiff Sierra Club had failed to name the developer of a project as the real party in interest in an action filed against the commission challenging the issuance of a permit authorizing a subdivision project; by the time plaintiff filed an amended petition naming the developer the action against the developer was barred. (*Id.,* at p. 498.) The court evaluated the facts under section 389 and concluded that "The precise relief which plaintiff here sought to obtain in its mandamus action was to set aside [developer's] permit to undertake certain construction. Obviously, a decision which was favorable to plaintiff would directly affect, and undoubtedly injure, [developer's] interests." (95 Cal.App.3d at p. 501.) The court noted that the developer would not be bound by a judgment adversely affecting the permit, and that disposition of the action in the developer's absence might impair his ability to protect his interests as well as leaving other parties to the action with inconsistent obligations because of the developer's claimed interest. (*Id.,* at pp. 501-502.)

This decision was relied on and followed in *Beresford Neighborhood Assn.* v. *City of San Mateo* (1989) 207 Cal.App.3d 1180 [255 Cal.Rptr. 434], where the appellate court affirmed the order sustaining the city's demurrer to plaintiff's complaint. In *Beresford,* a neighborhood group failed to join the

developer of a project in a suit challenging the city's actions in approving permits and taking other actions, including a zoning variance, which allowed the project to proceed. (*Id.*, at p. 1185.) Relying on *Sierra Club, Inc.* v. *California Coastal Com.*, *supra*, 95 Cal.App.3d 495, the city demurred to the zoning claims on the ground that the complaint failed to name the developer, that the developer was an indispensable party for purposes of the claims, and that the claims must therefore be dismissed. (207 Cal.App.3d at pp. 1187-1188.) Both the trial court and the appellate court agreed. (*Id.*, at p. 1189.)

The court in *Beresford* distinguished previous cases, which had allowed actions to proceed despite the failure to include a developer, on the grounds that the reasoning of *Sierra Club* did "not apply where the challenge is to a general plan [citations] or a local 'sphere of influence' plan [citation] because the determination will apply equally to all developments in the area. Unless a challenge is aimed at a 'specific developer,' the developer is not exposed to 'the prejudice necessary to make it an indispensable party.' [Citation.]" (*Beresford Neighborhood Assn.* v. *City of San Mateo*, *supra*, 207 Cal.App.3d at p. 1189.)

The challenge in the present case involves a particular developer—the Tribe—but it also involves the broader claim that the Agency exceeded its authority in entering into the DDA with the Tribe; thus, these facts are distinguishable from the circumstances in *Sierra Club* and *Beresford*. If it is established that the law of California does not permit a court to hear a challenge to the actions of the Agency in the present case because of an inability to join the Tribe in the suit, the effect will be to immunize any local entity from court review of transfers of publicly owned real property to Indian tribes. Unlike a challenge to a particular development project, which does not affect a later challenge to a subsequent project that might be proposed, and does not place the property at issue beyond the reach of the state's police power, the Agency here seeks to establish a rule of law that would exempt all future comparable transactions from scrutiny.

In light of the interests at stake in the case before us we find that this case is controlled by the policy recognized by the United States Supreme Court in *Nat. Licorice Co.* v. *Labor Board* (1940) 309 U.S. 350 [60 S.Ct. 569, 84 L.Ed. 799] and followed by the federal Court of Appeals for the Ninth Circuit in *Conner* v. *Burford* (9th Cir. 1988) 848 F.2d 1441. In *National Licorice* the National Labor Relations Board (NLRB) set aside contracts the National Licorice Company had obtained from its employees by means of unfair labor practices. (*Conner* v. *Burford*, *supra*, 848 F.2d at p. 1459, citing 309 U.S. at p. 356 [60 S.Ct. at p. 573].) The company argued that the

employees were indispensable parties to the action because they were parties to the contracts, and that the NLRB lacked authority to enter an order setting aside the contracts in the absence of the employees. (*Ibid.*) The Supreme Court disagreed. Comparing the NLRB action to antitrust injunctions and Federal Trade Commission orders, the court concluded that " 'the public right [is] vindicated by restraining the unlawful actions of the defendant even though the restraint prevent[s] his performance of the contracts.' " (*Conner* v. *Burford, supra,* 848 F.2d at p. 1459, citing 309 U.S. at p. 366 [60 S.Ct. at p. 578].) The court emphasized that the decision did not adjudicate the rights of the parties not before the court.

In *Makah Indian Tribe* v. *Verity* (9th Cir. 1990) 910 F.2d 555, the tribe brought an action to challenge federal regulations allocating the ocean harvest of migrating Columbia River salmon. The federal district court dismissed the action for failure to join 23 other tribes who had an interest in allocation of the harvest. (*Id.,* at p. 557.) The appellate court affirmed the dismissal as to reallocation of the past harvest, finding that as to those decisions the district court did not abuse its discretion. (*Id.,* at p. 560.) As to the procedural claims seeking only injunctive relief, however, the court reversed the dismissal and allowed the claims to proceed, noting that "The absent tribes would not be prejudiced because all of the tribes have an equal interest in an administrative process that is lawful." (*Id.,* at p. 559.) Citing the decision in *Conner* v. *Burford, supra,* 848 F.2d 1441, the court noted that "We have adopted the 'public rights' exception to traditional joinder rules." (910 F.2d at p. 559, fn. 6.) The court went on to state that "To the extent the Makah seek to enforce the duty of the [Pacific Fishery Management Council] and the Secretary [of Commerce] to follow statutory procedures in the future, this is a 'public right' and this action becomes one that potentially benefits all who participate in the ocean fishery." (*Ibid.*)

We conclude in the present case that the interest the public has in obtaining some level of review of the actions of the Agency in transferring property and placing it beyond the reach of the state's police power is sufficiently important that it provides an exception to the general application of the rule, under section 389, that an action challenging a contract should be dismissed if a party to the contract cannot be joined as a party. Unlike the court in *Makah Indian Tribe* v. *Verity, supra,* 910 F.2d 555, we cannot state here that the "absent [Tribe] would not be prejudiced because all of the [parties] have an equal interest in [a] . . . process that is lawful" (910 F.2d at p. 559); the Tribe is not subject to the laws that the Attorney General here seeks to enforce and the Tribe would have very little interest in enforcement of those laws. Nonetheless, this court must recognize the interest of the

citizens of the state, as represented by the Attorney General, in providing some review of the power of a local agency to permanently relinquish its interest in property within its control.

### 2. *Adequacy of the Judgment*

In this decision the third and fourth factors listed in section 389, subdivision (b), are implicated.[8] The third factor is the adequacy of the judgment that could be rendered in the absence of the unavailable party.

In the present case the judgment that could be rendered in the absence of the Tribe would be completely adequate. The only real issue to be considered by the court is whether the Agency had the power to enter into the contract it did with the Tribe. Although it is undeniable that the Tribe would be affected by the outcome of the court's decision on the issue, the presence or absence of the Tribe would not appear to have any direct impact on resolution of the legal issues themselves.

### 3. *Adequacy of the Remedy*

The fourth factor is the adequacy of the remedy available to the plaintiff if the action is dismissed for nonjoinder.[9] This factor has clearly weighed in our decision since there will be no remedy available to the Attorney General once the contract takes effect and the real property is transferred for the benefit of the Tribe. This factor has been considered also by other courts. (See, e.g., *Vanoni* v. *County of Sonoma* (1974) 40 Cal.App.3d 743, 747 [115 Cal.Rptr. 485] [suit brought by taxpayer against the county to challenge a contract entered into between the county and the United States; on appeal from sustaining of a demurrer, the appellate court stated that under section

---

[8]The second factor, the extent to which the judgment could shape relief to lessen the prejudice to the absent parties, has little relevance to the present circumstances.

[9]At oral argument counsel for the Agency brought to this court's attention an amendment to Health and Safety Code section 33426.5 that took effect January 1, 1997, and that states, in part, that a redevelopment agency shall not provide any form of direct assistance to a "development or business . . . for the acquisition . . . of property that is or would be used for gambling or gaming of any kind whatsoever . . . ." (Health & Saf. Code, § 33426.5, subd. (c).)

Section 2 of the statute comprising the amendment states that the amendment "shall not be deemed to invalidate, impair, or otherwise affect a contract or agreement between a redevelopment agency and a gambling-related business, entered into before April 1, 1996, provided that the agreement pertains to a specific project in a redevelopment project area that is in existence before January 1, 1997." (Stats. 1996, ch. 136, § 2.)

Counsel noted in argument that the statutory amendment would address the broader issue raised in the present case. However, in light of the limitations contained in section 2 of the statute, the amendment does not address the particular issue now before this court.

389, subdivision (b), action should be allowed to proceed notwithstanding plaintiff's inability to join the United States, which was party to the contract, primarily because plaintiff would otherwise be left with no remedy in the state court; however, the sustaining of the demurrer was affirmed on other grounds].)

The trial court here determined that under the authorities cited by the Agency, particularly *Enterprise Mgt. Consultants* v. *U.S.* ex rel. *Hodel, supra,* 883 F.2d 890, on the issue of whether the Tribe was indispensable, and *Beresford Neighborhood Assn.* v. *City of San Mateo, supra,* 207 Cal.App.3d 1180, on the issue of whether the Tribe actually claimed an interest in the subject matter of the suit, it was compelled to dismiss the action once it was established that the Tribe could not be made a party.

Our overall conclusion is that we cannot, "in equity and good conscience,"· affirm the trial court's dismissal of this action for failure to join the Tribe. A similar conclusion was reached by the court in *Manygoats* v. *Kleppe* (10th Cir. 1977) 558 F.2d 556, 559. There members of the Navajo Tribe filed suit against the Secretary of the Interior to· enjoin performance of an agreement between the tribe and Exxon Corporation that had been approved by the Secretary. Plaintiffs claimed that the environmental impact statement (EIS) prepared for the agreement was inadequate. The Secretary argued that the court should not reach the EIS issue because the action could not be sustained in the absence of the tribe. The district court agreed and dismissed the action. (*Id.,* at p. 557.)

The Court of Appeals reversed, stating, "Dismissal of the action for nonjoinder of the Tribe would produce an anomalous result. No one, except the Tribe, could seek review of an environmental impact statement covering significant federal action relating to leases or agreements for development of natural resources on Indian lands." (*Manygoats* v. *Kleppe, supra,* 558 F.2d at p. 559.) The court continued: "We are considering the case at the appellate level and are asked to review the order of the district court . . . . In equity and good conscience the case should and can proceed without the presence of the Tribe as a party." (*Ibid.*)

In the case before us it is undisputed that the trial court has jurisdiction over the suit and can enter a judgment that is binding on the parties before the court. We recognize the authorities relied on by the trial court, but in our view, the interests at stake in the present case are not comparable to the interests at issue in cases cited by that court. Thus, without arguing that those cases were incorrectly decided we have concluded that they are not

compelling precedent to be followed in deciding the case before us.[10] We conclude therefore that the trial court abused its discretion in granting the motion of the Agency to dismiss the action.

### DISPOSITION

The judgment of dismissal is reversed. Costs on appeal to be borne by respondent.

McKinster J., and Richli J., concurred.

Respondent's petition for review by the Supreme Court was denied October 15, 1997.

---

[10]We recognize that federal decisions are persuasive authority in state courts, particularly in areas, such as the one now before us, which involve state statutes or rules based on federal enactments. (See, e.g., *Crummer* v. *Beeler* (1960) 185 Cal.App.2d 851, 858 [8 Cal.Rptr. 698] [interpretation of state discovery provisions bases on federal rules]; *Douglas* v. *California* (1942) 48 Cal.App.2d 835, 838 [120 P.2d 927] [interpretation of state tax laws which are "substantially identical" to federal statutes].) We also recognize, however, that federal decisions, "although entitled to respect and careful consideration, would not be binding or conclusive on the courts of this state. [Citations.]" *(Bank of Italy etc. Assn.* v. *Bentley* (1933) 217 Cal. 644, 653 [20 P.2d 940].) In the present case we have reviewed the federal decisions and have found sufficient basis for distinguishing those cases, on both the facts involved and the policy considerations at issue, to warrant a departure from the weight of federal authority.