[No. D054688. Fourth Dist., Div. One. June 7, 2010.]

CITY OF SAN DIEGO, Plaintiff and Respondent, v.
SAN DIEGO CITY EMPLOYEES' RETIREMENT SYSTEM, Defendant
and Appellant.

**COUNSEL**

Seltzer Caplan McMahon & Vitek, Reginald A. Vitek and Michael A. Leone for Defendant and Appellant.

Jan I. Goldsmith, City Attorney, and Walter C. Chung, Deputy City Attorney, for Plaintiff and Respondent.

**OPINION**

**NARES, J.**—Although the San Diego City Employees' Retirement System (SDCERS) frames this appeal as a broad challenge to its authority to administer retirement system assets, this appeal actually involves a very narrow issue: Did SDCERS have the right to charge the City of San Diego (City) for SDCERS's underfunding of pension service credits during the time period of August 15, 2003, through November 1, 2003, when the authorizing statute states that the employees purchasing such service credits were and are to pay the full cost of service credits purchased? We conclude, as did the trial court, that this action by SDCERS was contrary to law and thus exceeded its authority to administer the pension system's assets, and the trial court properly set aside its decision to charge the City for the underfunding.

## INTRODUCTION

This action involves the purchase of service credit program, which, as a part of the City's pension plan for its employees, allows an active employee to purchase up to five additional years of pension service credit to increase his or

her lifetime pension annuity. In November 2007 the SDCERS board of administration (board) voted to charge the City for a shortfall in funding of service credits purchased by City employees. The City brought a petition for writ of mandate (petition) seeking to set aside that decision, arguing that City employees were obligated to pay the full purchase price of the service credits. The court granted the petition in part, finding that the board's decision was contrary to the City's municipal code and charter, which required the purchase of service credits by employees to be "cost neutral" to the City.

SDCERS appeals, asserting the court erred in granting the City's petition because (1) SDCERS has exclusive constitutional authority to administer retirement system assets; (2) the petition was barred by the statute of limitations; and (3) the City failed to join as necessary and indispensable parties those employees affected by the court's ruling. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   *City Establishes Service Credit Purchase Program*

In 1993 the City established the purchase of service credit program (PSC) to allow employees to purchase service credits for periods of actual service or authorized leaves of absence that were otherwise ineligible for service credits. In 1993 the city council passed ordinance No. O-17938, which created a new division of the San Diego Municipal Code (SDMC), sections 24.1301–24.1309, entitled "Purchase of Service Credit." The ordinance set forth specific categories for which service credits could be purchased, such as the six-month probationary period at the beginning of City employment; previous periods of City service; part-time or hourly service; reinstatement after no-fault employee termination; repayment of previously refunded member contributions; approved leaves of absence service previously not included in vesting requirement calculations; and military service.

In 1997 the PSC was expanded to include the purchase of service credits for periods that were not actually worked. The city council passed ordinance No. O-18383, which amended and repealed certain sections of the SDMC, and, of relevance to this appeal, created a "General Provision for Five Year Purchase of Service Credit," allowing employees to purchase up to five years of general service credit in addition to any other specific credit for which they were eligible (such as military service, approved leaves of absence, and part-time employment). This type of service credit is commonly referred to as "air time" credit.

It is undisputed that from its inception the PSC program was to be cost neutral to the City. In a 1996 memorandum from the City to SDCERS,

proposing to retain elements of the original PSC and adding the five-year purchase of service credit feature enacted in 1997, the City emphasized that employees "would pay into the retirement fund an amount, including interest, equivalent to the employee and employer full cost of such service."

### B.   *SDMC Section 24.1312*

SDMC section 24.1312, enacted pursuant to ordinance No. 0-18383, governs the purchase of service credits. Section 24.1312 states: "Any Member may purchase a maximum of five years of Creditable Service, in addition to any other Creditable Service the Member is eligible to purchase under this Division. The cost of Creditable Service purchased under section 24.1312 is the amount the Board determines to be the *employee and employer cost* of that Creditable Service." (Italics added.)

### C.   *San Diego Municipal Code Sections 24.0205 and 24.0305*

SDMC section 24.0205, applicable to general member employees, and SDMC section 24.0305, for safety member employees, states that subject to the rules and regulations prescribed by SDCERS, any member may elect to make additional contributions at rates in excess of his/her normal contributions for the purpose of providing additional benefits. These sections of the SDMC state that City shall *not* be liable for any additional contributions for said purchases: "The exercise of this privilege by a . . . member *shall not require the City to make any additional contributions.*" (SDMC, § 24.0305 italics added.)

### D.   *City Charter Section 143*

City charter, article IX, section 143 (Charter section 143), states that employees who contribute extra money for their pensions are only "entitled to receive the *proportionate* amount of increased allowances paid for by such additional contributions." (Italics added.) With regard to the City's obligation toward its employees' pensions, Charter section 143 also states that the City "shall contribute annually an amount substantially equal to that required of the employees for normal retirement allowances, as certified by the actuary, but *shall not be required to contribute in excess of that amount, except in the case of financial liabilities accruing under any new retirement plan or revised retirement plan because of past service of the employees.*" (Italics added.)

### E.   *SDCERS Established Service Credit Purchase Rates for Employees*

When the City established the PSC program in 1997, SDCERS's actuary advised the board that a two-tiered rate structure, 15 percent for general

member employees and 26 percent for safety member employees, would be sufficient to meet the requirement that the purchase price for service credits paid by employees be equivalent to the employer and employee cost. SDCERS's board approved the rate structure at its March 1997 meeting. City employees were then permitted to purchase service credits at the rates the board established.

F.  *City's Increase in Pension Benefit Formula*

Between 1997 and 2002, the City amended the SDMC sections governing general member employees' retirement allowance three times and safety member employees' twice. On each occasion, the City made increased retirement factors that were retroactive, i.e., applicable to past years of creditable service. This caused an increase in the value of years of service employees had purchased under the PSC program based upon the rates the board set in 1997.

G.  *SDCERS Sets New Service Credit Purchase Rates*

In a board meeting held in July 2002 SDCERS's then administrator, Larry Grissom, commented that underpricing of the PSC program costs to employees was creating an unfunded liability that the City was not supposed to bear: "And focusing on the five year, obviously the City adopted that benefit and put it in the Muni[cipal] Code with the understanding it would not increase the liability regarding the five year air time . . . ." Grissom told the board that it had a fiduciary duty to increase the purchase price of the service credits: "But now we are aware of this problem it seems like it is our fiduciary duty to fix it [be]cause every time somebody signs a purchase of service contract, or almost every time it seems like, we're increasing the liability to the plan sponsor, which isn't right. And the Board doesn't have the authority to allow subsidizing for the member's purchase. . . . [W]e need to fix the bleeding."

In August 2002 the board directed its actuary to evaluate whether the PSC rate structure set in 1997 reflected the current employer and employee costs of the benefit. The actuary completed his study in August 2003 and recommended to the board the rates be adjusted upwards to 27 percent for general member employees and 37 percent for safety member employees. In doing so, the actuary noted the 1997 rates were outdated because "they were set by the Board prior to certain benefit increases . . . ."

SDCERS Boardmember Terri Webster understood the fact the PSC was not cost neutral to the City. In a July 16, 2003 e-mail sent to Grissom she stated:

"As of June 30, 2002 the system has incurred an approximate $56 million loss due to the under funding of the [PSC] program. Said another way: since the system is charging 15% for General and 26% for Safety and the true cost is estimated to be over 25% for General and 30% for Safety, the system has incurred over $56 million in losses through June 30, 2002." Webster also recognized, as is shown by an August 11, 2003 e-mail from her to fellow Boardmember Ray Garnica, that SDCERS's failure to increase the costs of the PSC program was improper because it was to be cost neutral to the City: "The City created a benefit of buying 5 years of 'air time' in 1997. The Board was to administer it in a cost neutral manner. Instead the program has been administered by the Board at a loss to . . . the City . . . ."

At a meeting on August 15, 2003, the board discussed the actuary's proposed PSC price increase. A motion was made by Boardmembers Ronald Saathoff and Cathy Lexin to implement the actuary's proposed new rates. However, they proposed delaying implementing the cost increase for 60 days, allowing employees to continue to purchase service credits during that time using the old PSC pricing methodology. A member of the board expressed concern that the 60-day window allowing purchase of service credits at the old rates would not cover the costs of the benefit, and another board member asked who would bear the cost of the purchases during the 60-day window. In response, Boardmember Saathoff stated that the cost of the purchase during the 60-day period would be borne by the employees. The board approved the increased pricing, but allowed the 60-day window for employees to purchase credits under the old pricing methodology.

After that meeting SDCERS sent a notification to all City employees telling them that PSC purchase applications received by SDCERS before November 1, 2003, would be priced under the old rates—15 percent for general member employees and 26 percent for safety members. During that 60-day window, 5,726 years of service were purchased by 1,609 general members, and 828 years was purchased by 412 safety member employees. During this 60-day window, general member employees purchased more years than they had purchased since the PSC inception in 1997. Safety member purchases nearly doubled the amount purchased in previous years.

H. *SDCERS Votes to Charge City for Underfunding*

In August 2007 SDCERS's actuary informed SDCERS that its non-cost-neutral pricing of PSC credits accounted for $146 million of the unfunded actuarial liability of SDCERS.

At an October 2007 public meeting of the SDCERS board, SDCERS's fiduciary counsel informed the board that they had the "1. Duty to preserve and protect the fund; to pay benefits that are promised and earned and *collect sufficient contributions to support the benefits*. 2. Duty to *correct errors when appropriate and not perpetuate erroneous interpretations of the plan*." (Italics added.) The fiduciary counsel opined that SDCERS could legally take several courses of action to remedy the underfunding, including "voiding contracts," "collecting arrears payments," "offering rewritten contracts," "spreading out additional payments," "reducing benefit levels," and "continuing to collect the shortfall through the amortization of the system's unfunded liability."

At a meeting on November 16, 2007 (November 16 meeting), the board decided to charge the City for the unfunded liability. SDCERS's board voted unanimously to "continue to amortize the shortfall through the existing unfunded actuarial liability." In lay terms, the board voted to charge the City for the underfunding.

## I. City's Petition for Writ of Mandate

Four days after the board's November 16 meeting, the City filed a verified petition for writ of mandate, seeking an order commanding SDCERS to "set aside its . . . November [16], 2007 action in full; and . . . take no further action absent full compliance with San Diego Ordinance [No.] 0-18383 and [SDMC] Section 24.1312." Thereafter, the City filed a first amended petition, which limited its scope to setting aside the November 16 vote as to "all persons who have not yet retired as of the date the petition in this matter was first filed."

SDCERS opposed the petition, arguing (1) because the vote did not set additional credit service purchase rates, no duty was implicated by SDMC section 24.1312; (2) the board properly exercised its constitutional discretion to amortize the net actuarial deficiency because the City was responsible for the deficit by virtue of its retroactive retirement factor enhancements; (3) the case was barred by the statute of limitations; and (4) the City failed to join as parties the employees impacted by any favorable ruling.

## J. Court's Ruling

In November 2008 the court heard oral argument on the City's petition. The court indicated that it was focused on the time period between August 15, 2003, when SDCERS's board adopted the new pricing of PSC rates, and November 1, 2003, when those rates went into effect.

After taking the matter under submission, the court granted the City's petition in part and denied it in part. The court concluded that the November

16 vote was unlawful under Charter section 143 and SDMC section 24.1312 because "[a]t least part of the 'shortfall' referred to in the 11/16/07 action did not 'accru[e] under any new retirement plan or revised retirement plan because of past service of the employees' because some service credits were purchased after the three retroactive increases to the retirement factor multiplier were established. Moreover, there is no dispute that SDMC [section] 24.1312 provides that the purchase of service credits shall be 'cost-neutral' to the City. It was unlawful to charge City for the shortfall that resulted for the service credits that were purchased between the establishment of new rates in August 2003 and November 1, 2003. [¶] The 11/16/07 action is set aside."

The court declined to issue an order commanding the board to "take no further action absent full compliance with San Diego Ordinance [No.] 0-18383 and [SDMC] Section 24.1312." The court also denied SDCERS's defenses that the petition was barred by the statute of limitations and that the City failed to name necessary and indispensable parties.

## DISCUSSION

### I. *STANDARD OF REVIEW*

In reviewing a judgment granting a writ of mandate, we apply the substantial evidence standard of review to the court's factual findings, but independently review its findings on legal issues. (*Stryker v. Antelope Valley Community College Dist.* (2002) 100 Cal.App.4th 324, 329 [122 Cal.Rptr.2d 489].) Interpretation of statutes, including local ordinances and municipal codes, is subject to de novo review. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].)

### II. *ANALYSIS*

#### A. *Board's Plenary Authority to Administer Retirement Plan Assets*

SDCERS asserts the court erred in setting aside the November 16, 2007 vote to charge the City for underfunded amounts caused by purchases of service credits at old purchase rates between August 2007 and November 1, 2007, because it had "plenary authority to administer Retirement System Assets," including the decision to charge the City for the shortfall. This contention is unavailing because while SDCERS had exclusive authority to administer plan assets, it did not have plenary authority to evade the law.

■ It is true, as SDCERS argues, that public employee retirement system boards operate under a constitutional grant of plenary authority which grants to them "sole and exclusive fiduciary responsibility over the assets of the

public pension or retirement system." (Cal. Const., art. XVI, § 17, subd. (a) (article XVI, section 17(a).) This grant of exclusive authority over retirement system assets was intended to protect such boards from "political meddling and intimidation" and to "strictly limit the Legislature's power over such funds." (Prop. 162, §§ 2, subd. (f), 3, subds. (e) & (g) (eff. Dec. 12, 1992).) Article XVI, section 17 was intended to "insulate the administration of retirement systems from oversight and control by legislative and executive authorities." (*Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180, 1192 [49 Cal.Rptr.2d 220].) ■ Similarly, the City's charter gives the board "exclusive control of the administration and investment of such fund or funds as may be established." (City charter, art. IX, § 144.)

However, this does not means those powers are without limit. In *Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095 [130 Cal.Rptr.2d 149] (*Westly*), the California Public Employees' Retirement System Board of Administration (CalPERS) sought to exempt certain of its employees from the state civil service system, contrary to article VII, section 4, and article XVI, section 17, of the California Constitution, along with a number of statutory provisions. CalPERS defended its action based upon its " 'plenary authority' " to administer the state employees' pension system as set forth in article XVI, section 17. (*Westly, supra*, 105 Cal.App.4th at p. 1099.) The Court of Appeal rejected CalPERS's argument, holding its board "does not have plenary authority to evade the law that limits the pay of the [CalPERS] Board and its employees, that specifies the employees exempt from civil service, and that authorizes the Controller to issue warrants and audit their legality." (*Id.* at p. 1100.) In doing so, the *Westly* court held that the board's plenary authority to administer the pension system was "limited to actuarial services and to the protection and delivery of the assets, benefits, and services for which the Board has a fiduciary responsibility." (*Id.* at p. 1110.) That authority did not extend to matters within the purview of other branches of government and did not encompass areas not expressly dedicated to the board. (*Id.* at p. 1106.)

■ Under article XVI, section 17(a), "[p]lenary power does not mean unreviewable power" and does not "insulate pension boards from judicial oversight." (*Board of Retirement v. Santa Barbara County Grand Jury* (1997) 58 Cal.App.4th 1185, 1193 [68 Cal.Rptr.2d 607]; see *Singh v. Board of Retirement, supra*, 41 Cal.App.4th at p. 1190, fn. 9.)

■ The granting of retirement benefits is a legislative action within the exclusive jurisdiction of the City. (City charter, art. IX, § 141.) It is undisputed that the enabling legislation passed by the City for purchase of service

credits specifically dictated that the total cost of such purchases would be borne by the employees. Charging the City for SDCERS's underfunding exceeded SDCERS's authority as it was in violation of this legislation and exceeded its powers to administer retirement benefits.

■ It is not within SDCERS's authority to expand pension benefits beyond those afforded by the authorizing legislation. This is because the granting of retirement benefits is a power resting exclusively with the City. The scope of the board's power as to benefits is limited to administering the benefits set by the City. When the board decided to charge the City for the underfunding, that decision was in violation of the law and thus exceeded its power.

SDCERS asserts the court erred in relying on Charter section 143 and SDMC section 24.1312. This contention is unavailing.

■ The SDCERS claims the court erred in relying on SDMC section 24.1312 to find the November 2007 vote unlawful because that statute only applies to service credit price setting and not ongoing administration of the retirement system assets. Again, however, the board's authority to administer the retirement assets does not empower it to act in a manner that violates that statute. It is undisputed that SDMC section 24.1312 requires that employees purchasing service credits must do so in an amount equal to the "employee and employer cost" and charges the board with the responsibility of determining that amount. It does not allow the board, under the guise of "administering" the retirement assets, to charge the City for amounts that are owing from employees because the board chose to allow employees to purchase credits from August 15 through November 1, 2003, at a rate that was less than the "employee and employer cost." As SDMC section 24.0205 (for general member employees) and SDMC section 24.0305 (for safety member employees) specify, if an employee elects to make additional contributions to purchase service credits, "[t]he exercise of this privilege by a [general or safety] member *shall not require the City to make any additional contributions*." (SDMC, § 24.0305, italics added.)

SDCERS asserts the court erred in relying on Charter section 143 because the board's vote did not set the City's annual employer contribution. However, Charter section 143 supports the court's ruling because while it allows employees to "have the option to contribute more than required for normal allowances," if an employee makes such additional contributions, the employee is only "entitled to receive the proportionate amount of increased allowances paid for by such additional contributions." Charter section 143 thus confirms that the City must contribute payments substantially equal to those of the employee only for *normal* retirement allowances. The employee must bear the cost of any *additional* contributions.

SDCERS also contends that the City's enactment of retroactive increases in retirement allowances constituted a "financial liability" accruing under a "revised retirement plan" because of "past service of employees" under Charter section 143, which excepts such retroactive increases from the scope of its "substantially equal" requirement. However, the court omitted from its ruling any underfunding caused by the City's retroactive increase in retirement benefits when it found that "[a]t least part of the 'shortfall' referred to in the 11/16/07 action did not 'accru[e] under any new retirement plan or revised retirement plan because of past service of the employees' because some service credits were purchased after the three retroactive increases to the retirement factor multiplier were established." The court's ruling was very narrow, only applying to the underfunding that occurred because of lower rates of contribution allowed by the board between August 15 and November 1, 2003, and only that underfunding that was not caused by a "new retirement plan or revised retirement plan because of past service of the employees."

SDCERS also relies upon SDMC section 24.0801, which provides that "[a]ll deficiencies that occur *due to the adoption of any Retirement Ordinances* must be amortized over a period of thirty years or less." (Italics added.) However, the deficiency the City targeted in its petition, and that the court relied upon in making its ruling, was *not* caused by the adoption of a retirement ordinance. The ordinance creating the PSC program specified that it would be paid for by the employees and would be cost neutral to the City. However, SDCERS allowed employees to purchase service credits at a discounted rate between August 15, 2003, and November 1, 2003. It was that action that caused the deficiency SDCERS later tried to charge to the City.

SDCERS asserts that it had a fiduciary duty to allow employees to purchase service credits for 60 days at the lower rate under the California Supreme Court's decision in *Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374 [216 Cal.Rptr. 733, 703 P.2d 73] (*Hittle*). However, *Hittle* does not support this argument.

In *Hittle*, a disabled employee was not informed of his eligibility for disability retirement by his pension plan administrator, and he thereafter withdrew his retirement contributions because he was unable to work and his service retirement had not vested. (*Hittle, supra,* 39 Cal.3d at pp. 381–382.) When he learned that he was in fact eligible to apply for a disability retirement, he sought to redeposit his contributions and reinstate his retirement benefits. When the plan administrators denied his request, he brought a petition for writ of mandate seeking to set aside that decision. (*Id.* at pp. 382–383.) The California Supreme Court issued a writ of mandate compelling the county's retirement association to reinstate him in the plan because it had failed to inform him that he was eligible for a disability

retirement. In so doing the high court stated the retirement plan administrators had a "fiduciary duty to fully inform its members . . . of their retirement options." (*Id.* at p. 391; see *id.* at pp. 392–394.)

However, in this case City employees were *not* entitled to purchase service credits at a rate that did not reflect the full cost of those credits. SDCERS did not have a duty to inform employees of a benefit to which they were not entitled and certainly had no duty to allow them a 60-day window to purchase service credits at a price it knew was below the full cost of the benefit. Unlike in *Hittle*, a failure to notify employees they had 60 days to purchase service credits at the lower rate would not result in a loss of a benefit to which they were entitled. Rather SDCERS was merely increasing the price so as to be in compliance with SDMC section 24.1312 and ensure that future purchases would not create additional unfunded liability.

■ In sum, the court did not err in finding that SDCERS's decision to charge the City for the underfunding of the PSC between August 15 and November 1, 2003, was unlawful.

B. *SDCERS's Statute of Limitations Defense*

SDCERS asserts that if it was unlawful to charge the City for service credits purchased between August 15, 2003, and November 1, 2003, the writ should have been denied because it was barred by the statute of limitations. Specifically, SDCERS contends the focus of the City's writ was not the action the board took in November 2007, but the board's actions in underpricing the service credits between August 15, 2003, and November 1, 2003. This contention is unavailing.

While the actions of the board in 2003 created the underfunding, it was not that action the City was challenging. Rather, it was the November 2007 decision to *charge the City* for that underfunded amount that the City sought to set aside. The actions by the board in 2003 that created the underfunding were relevant to provide a historical background to the board's vote in 2007. However, until that vote was taken on November 16, 2007, the board had various options, as pointed out by its fiduciary counsel, to rectify the decision it made to allow employees to purchase service credits in an amount that would not cover their cost. The board's decision in November 2007 to charge the City for the shortfall was what the petition challenged and what the court found unlawful.

Further, in 2003 when SDCERS voted to allow service credits to be purchased at the old rates for a period of 60 days and a concern was raised as to who would pay the cost of purchases made during that time period,

Boardmember Saathoff confirmed the cost of the benefit would be borne by the employees. There was no indication at that 2003 meeting that the City would bear any of the cost of purchases made at the old rates. There was also no decision made to charge the City for any resultant underfunding.

Moreover, the unfunded liability was not created as of 2003. It occurred over several years and may have been avoided entirely if, for example, the retirement fund experienced better than expected investment returns, or, as stated above, SDCERS had taken action to ensure employees were responsible for the full cost of service credits purchased during the 60-day period in 2003. It was not until August 2007 that SDCERS announced a shortfall existed—and the amount of the shortfall. It was not until November 2007 that SDCERS voted to charge the City, as opposed to employees, for the underfunding.

The City's petition was filed four days after the board's November 2007 vote. Thus, it was unquestionably timely.

### C. *Necessary/Indispensable Parties*

SDCERS contends that the 2,021 employees who purchased service credits between August 15, 2003, and November 1, 2003, were necessary and indispensable parties and the court erred in failing to join them as defendants in the action. We reject this contention.

The parties agree on the applicable legal principles governing indispensable parties. Under Code of Civil Procedure section 389, subdivision (a) a person is a "necessary" party to a proceeding if "(1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

If a person is determined to qualify as a "necessary" party under one of the standards outlined above, courts then determine if the party is also "indispensable." Under this analysis "the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable. The factors to be considered by the court include: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other

measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder." (Code Civ. Proc., § 389, subd. (b).)

None of these factors is determinative or necessarily more important than another. (*County of Imperial v. Superior Court* (2007) 152 Cal.App.4th 13, 35 [61 Cal.Rptr.3d 145]; *County of San Joaquin v. State Water Resources Control Bd.* (1997) 54 Cal.App.4th 1144, 1149 [63 Cal.Rptr.2d 277].) Further, the court's consideration of these factors largely depends on the facts and circumstances of each case. (*Bakia v. County of Los Angeles* (9th Cir. 1982) 687 F.2d 299, 301.) "Whether a party is necessary and/or indispensable is a matter of trial court discretion in which the court weighs 'factors of practical realities and other considerations.' " (*Hayes v. State Dept. of Developmental Services* (2006) 138 Cal.App.4th 1523, 1529 [42 Cal.Rptr.3d 363].) "A court has the power to proceed with a case even if indispensable parties are not joined. Courts must be careful to avoid converting a discretionary power or rule of fairness into an arbitrary and burdensome requirement that may thwart rather than further justice." (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 26.)

For example, where existing and absent parties' interests are sufficiently aligned such that the absent party's rights will not be affected or impaired by the judgment or proceeding, the absent party need not be joined. (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at pp. 27–28.)

Thus, in *People ex rel. Lungren v. Community Redevelopment Agency* (1997) 56 Cal.App.4th 868 [65 Cal.Rptr.2d 786] (*Lungren*), the California Attorney General brought an action against a community redevelopment agency seeking to set aside that agency's contract with a Native American tribe that would have transferred city-owned property to the tribe. The Attorney General challenged the legality of the contract, but did not name the tribe as a party. (*Id.* at pp. 870–871.) The agency sought dismissal of the action, arguing the tribe was an indispensable party, and the trial court agreed, dismissing the complaint. (*Id.* at pp. 873–874.)

The Court of Appeal reversed. In doing so, the court held that the tribe's interests were adequately represented by the agency because the only issue was the legality of the contract: "It cannot be doubted that the Tribe can claim an interest relating to the subject of the action. The project in which the Tribe has a substantial interest will either proceed or not proceed depending on the outcome of the suit. It is less clear, however, that the absence of the Tribe in the present action will, as a practical matter, impair or impede the Tribe's ability to protect its interests. The issue raised in the present case is

the legality of the Agency's actions in agreeing to relinquish City-owned property and placing it beyond the reach of the civil and criminal jurisdiction of the state. The actions of the Tribe in entering into the [contract] are not challenged. The Tribe's ability to look after its own interests in this setting would be limited to the opportunity to argue that the Agency's actions were permitted by California law. It would thus appear that, although the Tribe and the Agency have interests under the [contract] that are not identical, the Tribe's object in the present litigation—establishing that the Agency acted lawfully in entering into the [contract]—would duplicate that of the Agency and would be adequately represented by the Agency in the present litigation." (*Lungren, supra*, 56 Cal.App.4th at p. 877.)

The Court of Appeal then determined that it could not " 'in equity and good conscience,' affirm the trial court's dismissal of this action for failure to join the Tribe." (*Lungren, supra*, 56 Cal.App.4th at p. 884.)

Similarly in this case, the issue before the court was the legality of the decision by SDCERS to charge the City for the unfunded portion of the purchase price of service credits. The employees, if joined, would, as SDCERS did, argue that SDCERS's action was lawful. Their object, as the tribe in *Lungren*, would be the same as that of SDCERS. Indeed, SDCERS has not asserted that the affected employees have an argument or defense separate or different than that entity. Thus, the 2,021 employees who purchased service credits between August 15, 2003, and November 1, 2003, were adequately protected by SDCERS, and the court did not abuse its discretion in refusing to join them as necessary and indispensable parties.

## D. *Court's Denial of Part of Relief Sought by the City*

As noted, *ante*, the court denied the City's request that that it order SDCERS "take no further action absent full compliance with San Diego Ordinance [No.] 0-18383 and [SDMC] Section 24.1312." SDCERS asserts that the denial of this request results in an inconsistent ruling. This contention is unavailing.

The trial court's ruling found that the board's November 16, 2007 action was unlawful. Therefore, SDCERS cannot charge the City for the underfunding subject to that ruling or it would be in violation of the judgment. No further order was necessary by the court. In fact, it was proper to deny this relief as it allows SDCERS to take what action it deems necessary to resolve the situation without having to first determine if it is in violation of the law. The only thing SDCERS may not do is charge the City for the underfunding that was the subject of the court's order. Accordingly, the court's order is not inconsistent.

## DISPOSITION

The judgment is affirmed. The City shall recover its costs on appeal.

McConnell, P. J., and O'Rourke, J., concurred.