Filed 3/13/24  Backcountry Against Dumps v. San Diego County Bd. of Supervisors CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| BACKCOUNTRY AGAINST DUMPS et al.,<br><br>  Plaintiffs and Appellants,<br><br>  v.<br><br>SAN DIEGO COUNTY BOARD OF SUPERVISORS,<br><br>  Defendant and Respondent;<br><br>BOULDER BRUSH, LLC,<br><br>  Real Party in Interest and Respondent;<br><br>CAMPO BAND OF DIEGUENO MISSION INDIANS,<br><br>  Intervener and Respondent. | D081530<br><br><br><br>(Super. Ct. No. 37-2021-00017245- CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Reversed and remanded with instructions.

Law Offices of Stephen C. Volker, Stephen C. Volker, Stephanie L. Clarke and Jamey M.B. Volker for Plaintiffs and Appellants.

Claudia G. Silva, County Counsel, and Joshua M. Heinlein, Deputy County Counsel for Defendant and Respondent.

Cox, Castle & Nicholson, Andrew B. Sabey, Anne E. Mudge, Lisa M. Patricio and Robbie C. Hull for Real Party in Interest.

Procopio, Cory, Hargreaves & Savitch, Kendra J. Hall, Rebecca L. Reed and David Gouzoules for Intervener and Respondent.

## I. INTRODUCTION

Backcountry Against Dumps, Donna Tisdale, and Joe E. Tisdale (Appellants) appeal from the trial court's dismissal of their petition for writ of mandate objecting to the approval by the San Diego County Board of Supervisors (the Board) of the Boulder Brush Facilities (the Boulder Brush Project). The Boulder Brush Project consists of a 3.5 mile long, 230-kilovolt overhead transmission line, a high-voltage substation, a 500-kilovolt switchyard, and various other improvements to a 320-acre corridor of private land, that will be used to connect two newly planned windmill farms to San Diego Gas & Electric's existing transmission lines. The larger of the two windmill installations will consist of approximately 60 windmills that will be constructed entirely within the reservation of the Campo Band of Diegueño Mission Indians (Campo, or the Tribe).

Appellants named the Board as the respondent in their petition and named Boulder Brush, LLC (Boulder Brush)—the project applicant and recipient of approvals—as the real party in interest. They asserted the Board's approval of the Boulder Brush Project violated the California

2

Environmental Quality Act (CEQA) (Pub. Resource Code, § 2100 et. seq.),[1] and various planning and zoning regulations.  Approximately one year after Appellants filed the petition, Campo moved to intervene for the limited purpose of seeking a dismissal based on the tribe's sovereign immunity.  The trial court granted both the motion to intervene and a subsequent motion to dismiss the petition pursuant to Code of Civil Procedure section 389,[2] and entered a judgment of dismissal against Appellants.

Appellants assert the trial court erred in doing so because it failed to recognize that Public Resource Code section 21167.6.5 preempts section 389 and, regardless, Campo is not a necessary or indispensable party under section 389, in part because its interests are adequately represented by Boulder Brush and the Board.  Appellants assert further that the trial court erred in relying on federal authority that is inapposite because it does not address the regulation of a proposed project on private non-reservation land. We decline to address Appellants' preemption argument but agree that the cited federal authority is distinguishable and conclude that Campo is not a

[1]    "The term 'CEQA Guidelines' refers to the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and 'prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of [CEQA].'  (CEQA Guidelines, § 15000.)"  (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2.)  Subsequent references to "Guidelines" are to the CEQA guidelines found in California Code of Regulations, title 14, section 15000 et seq.

[2]    All further unspecified statutory references are to the Code of Civil Procedure.

necessary or indispensable party under section 389. We therefore reverse the judgment of dismissal and remand the matter to the trial court for further proceedings consistent with this opinion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Boulder Brush Project and Associated Approvals*

The present litigation arises from the Board's approval of the Boulder Brush Project following a Final Environmental Impact Report (FEIR) prepared in accordance with CEQA. The original notice of preparation of an EIR described the Boulder Brush Project as follows: "Boulder Brush, LLC proposes an overhead 230 kilovolt (kV) gen-tie transmission line, a substation to increase the voltage to 500 kV, and a switchyard on private land under the jurisdiction of the County of San Diego. The gen-tie line would carry wind energy from a proposed wind energy project [(the "Campo Wind Project")] on the Campo Indian Reservation ("Reservation") to the existing Sunrise Powerlink. The portion of the gen-tie line on private land would be approximately 3.5 miles in length, and would include 32 steel poles at a maximum height of 150 feet. The applicant also proposes permanent and temporary access roads, temporary staging areas, and a temporary concrete batch plant." However, the Board acknowledged that while "the majority of the Campo Wind Project is not within the County's jurisdiction and is not subject to the County's land use regulations, the [overall] [p]roject for CEQA

4

purposes is considered to be all facilities required for the development of the Campo Wind Project."[3]

Accordingly, the FEIR explains: "The [overall] [p]roject consists of the Campo Wind Facilities that would be located on land leased from [Campo] within the 16,000-acre Reservation Boundary, and the Boulder Brush Facilities that would be located on adjacent land to the northeast of the Reservation leased from a private landowner within the Boulder Brush Boundary." The FEIR uses the term "On-Reservation" to refer to portions within the reservation boundary and "Off-Reservation" to refer to the portion outside the reservation boundary, or, on private land, and we likewise adopt these terms in this opinion.

The FEIR "addresses the [p]roject as a whole," but acknowledges "the County's land use jurisdiction is limited to the private lease lands within the Boulder Brush Boundary (i.e., the Boulder Brush Facilities)." The FEIR clarifies that "[t]he Bureau of Indian Affairs (BIA) has jurisdiction over the portion of the Project within the Reservation Boundary (i.e., Campo Wind Facilities), and has prepared an Environmental Impact Statement (EIS) to

---

[3]    The FEIR defines the Boulder Brush Project and the Campo Wind Project as two separate components of a larger proposed wind energy project. The FEIR acknowledges that the purpose of the Boulder Brush Project is to connect the Campo Wind Project to the San Diego Gas & Electric grid, and therefore considers the overall impact of both. However, as we explain, the FEIR also expressly acknowledges that the Board approval is limited to the Boulder Brush Project, because that is the only portion over which the County has jurisdiction. We use the same terms, Boulder Brush Project and Campo Wind Project, herein to distinguish between the different portions of the proposed wind energy project.

evaluate the impacts of the Project under the National Environmental Policy Act (NEPA)."  "The BIA is the Lead Agency for the Project under NEPA," and the "County is a cooperating agency for the EIS."  The EIR "adopts and incorporates by reference the EIS."

The FEIR breaks the project out into separate components, beginning with the Boulder Brush Facilities.  The FEIR considers several different impacts of the project for both the On- and Off-Reservation portions.  It concludes that the Off-Reservation Boulder Brush Facility, specifically, would have potentially significant impacts to the community character aesthetics, habitats of the federally protected Quino checkerspot butterfly and other special-status plant and wildlife species, jurisdictional aquatic resources, and wildfire hazards.

The FEIR presents four potential alternatives to the proposed Boulder Brush Project: 1) a no project alternative; 2) a no Boulder Brush Facilities on private lands alternative; 3) an alternative gen-tie route within the existing Boulder Brush boundary; and 4) an underground gen-tie within the Boulder Brush Boundary.  The second alternatives "assumes that the Boulder Brush Facilities would not be developed and the existing conditions on lands within the County's land use jurisdiction would remain."  Instead, "the connection of power generated on the Reservation by the 60 wind turbines to the grid via the Sunrise Powerlink, via a gen-tie route that extends across the Manzanita Band of Diegueño Mission Indians' (Manzanita) Reservation and Bureau of Land Management (BLM) managed lands, connecting to a substation on a portion of the Sunrise Powerlink on BLM managed lands."  The FEIR concludes that it is not possible to determine whether this alternative is feasible because the County does not have any authority over the Manzanita or BLM lands.  The third alternative, an alternate orientation of the gen-tie

6

route, would increase the overall length of the gen-tie line by 0.2 miles, but would decrease the total disturbance in the area by 8 to 10 acres. The FEIR concludes that the third alternative, the alternate route for the gen-tie line, would be the "environmentally superior" alternative.

Finally, the FEIR includes responses to each comment received on the Draft EIR. The FEIR provides individual responses as well as general responses to the following nine topics commonly raised during the comment period: 1) socioeconomic impacts; 2) public health; 3) piecemealing; 4) noise; 5) biological resources; 6) groundwater; 7) fire protection services and wildfire impacts; 8) visual impacts; and 9) aviation.

After considering these concerns, and the responses, the Board approved the Boulder Brush Project on March 17, 2021, and filed a CEQA Notice of Determination the next day, March 18, 2021. The minutes from the Board approval meeting note: "The [p]roject under [County] jurisdiction is a *component* of the larger Campo Wind Project, which will generate 252 megawatts of wind energy, enough electricity for 70,000 homes. A total of 60 wind turbines and other supporting infrastructure will be located on land leased from the [Tribe] within the Campo Reservation, and therefore are not subject to any County permits. [¶] The [p]roject under the County's land use jurisdiction *is limited* to a 3.5-mile 230-kilovolt overhead transmission line, a substation, a switchyard, and access roads in the Boulevard Subregional Plan Area located in the Mountain Empire Subregional Plan." (Italics added.)

## B. *The Petition for Writ of Mandate*

Appellants filed their petition for writ of mandate challenging the approvals on April 19, 2021, along with a notice that they intended to lodge the administrative record from the CEQA proceedings with the trial court.

7

In the petition, they state, "[t]he primary purpose of the [Boulder Brush Project] is to connect a proposed 60-turbine Campo Wind Project on the Reservation of the Campo Band of Diegueño Mission Indians to San Diego Gas & Electric's . . . existing Sunrise Powerlink transmission lines." The [Boulder Brush Project] would be located within an approximately 320-acre corridor on privately owned land just north of the community of Boulevard . . . and would include (1) an approximately 3.5-mile-long, 230-kilovolt ('kV') overhead gen-tie line, supported by 32 steel pole structures up to 150 feet tall, (2) a high-voltage substation, (3) a 500-kV switchyard, (4) access roads, (5) three 10,000-gallon water tanks, and (6) additional cleared space around the facilities." The petition acknowledges that the Board did not approve either the Campo Wind Project or the other proposed windmill farm in its approvals.

Appellants allege in the petition that the Board's statement of overriding considerations is not supported by substantial evidence and that the EIR violates CEQA on numerous grounds, including because it fails to adequately analyze impacts to golden eagles, bats, local groundwater resources, and wildfires. They allege further that the approval was improper because the project as a whole would violate the County General Plan and zoning ordinances. Based on those allegations, Appellants seek injunctive relief and a peremptory writ of mandate directing the Board "to set aside and vacate its certification of the FEIR and adoption of the Project Approvals."

C.  *The Motions to Intervene and Dismiss*

The parties submitted a stipulation regarding a joint briefing and hearing schedule on March 24, 2022—after Appellants had compiled the administrative record and submitted it to the County for certification. The

8

stipulation did not mention Campo or contain any suggestion that Campo would be moving to intervene or dismiss.

Approximately two weeks later, on April 7, 2022, Campo filed its motion to intervene for the limited purpose of dismissing the petition on sovereign immunity grounds. Campo defined the project at issue more broadly—as the "construction and operation of a $400 million renewable energy project"—and argued that it had a material interest in the project that would not be adequately represented by any other party in its absence. It asserted, further, that if Appellants succeeded in their petition, the project would be halted, "threatening tens of millions of dollars of tribal revenue, jobs for Tribe [m]embers, and the Tribe's sovereign right to control tribal resources on its property."

Appellants disputed this assertion in their opposition and argued: "Compliance with CEQA, as sought in this lawsuit, is of course merely procedural, and thus it will not permanently block this [p]roject. Instead, the County's compliance will make it a better [p]roject by identifying ways to reduce its impacts. Compliance with CEQA will improve the [p]roject's siting, design, construction and operation, and more fully mitigate its effects, and thus better serve both the Campo Band on whose Reservation the [Campo Wind Project portion] would be built, and the surrounding community that will share its impacts."

The trial court granted Campo's motion to intervene and, as expected, the Tribe filed a motion to dismiss on sovereign immunity grounds. Once again, Campo asserted the petition sought to prevent construction of the Boulder Brush Facility, that the windmills on the Campo reservation " 'could not operate—and indeed would not be built—without the Boulder Brush Facilities,' " and that Campo was thus an indispensable party under section

9

389, subdivision (a). However, Campo argued further, the Tribe could not be made a party on account of their sovereign immunity and so, the petition must be dismissed.

Appellants countered that Campo was not an indispensable party, because its interests in the Boulder Brush Facility portion of the project are adequately represented by Boulder Brush and the Board. They asserted further that Public Resource Code section 21167.6.5, subdivision (d), which provides that "[f]ailure to name potential persons, other than those real parties in interest described in subdivision (a), is not grounds for dismissal pursuant to [s]ection 389," pre-empted Campo's argument under section 389, since the Tribe was not named in the notice of determination, and therefore did not need to be named as a real party in interest in the underlying petition.[4]

The trial court rejected both arguments, granted Campo's motion to dismiss, and entered a judgment of dismissal.

Appellants filed a timely notice of appeal.

### III. DISCUSSION

Appellants raise the same issues as they did in the trial court, and assert that Campo is not a necessary party because its interests are

---

[4] Public Resource Code section 21167.6.5, subdivision (a) requires a party challenging a public agency's notice of determination under CEQA to name, as a real party in interest in the petition, "the person or persons identified by the public agency in its notice filed pursuant to subdivision (a) or (b) of Section 21108 or Section 21152," and Public Resource Code section 21152 requires the Board to file a notice of determination when approving a project following the preparation of a FEIR.

10

adequately represented by another existing party; that the trial court erred in relying on inapposite federal authority to conclude the factors set forth in Code of Civil Procedure section 339, subdivision (b) weighed in favor of dismissal; and that Public Resource Code section 21167.6.5, subdivision (d) pre-empts Code of Civil Procedure section 339, subdivision (b).

## A. *Statutory Law Governing Intervention and Joinder*

Code of Civil Procedure section 387 governs intervention of nonparties to an action or proceeding. Section 387, subdivision (d)(1) requires the trial court to permit a nonparty to intervene if "[a] provision of law confers an unconditional right to intervene," or the party "seeking intervention claims an interest relating to the property or transaction that is the subject of the action and that person is so situated that the disposition of the action may impair or impede that person's ability to protect that interest, unless that person's interest is adequately represented by one or more of the existing parties." (§ 387, subd. (d)(1)(A), (B).) In addition, section 387, subdivision (d)(2) provides the trial court discretion to "permit a nonparty to intervene in the action or proceeding if the person has an interest in the matter in litigation, or in the success of either of the parties, or an interest against both," but does not qualify for mandatory intervention under section 387, subdivision (d)(1).

Likewise, section 389 governs joinder of parties. " '[S]ection 389 subdivision (a) defines persons who should be joined in a lawsuit if possible, sometimes referred to as "necessary" parties.' " (*Dreamweaver Andalusians, LLC v. Prudential Ins. Co. of America* (2015) 234 Cal.App.4th 1168, 1173 (*Dreamweaver*).) Section 389, subdivision (a) provides: "A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in

11

the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.  If he has not been so joined, the court shall order that he be made a party."

" 'A determination that a person is a necessary party [under section 389, subdivision (a)] is the predicate for the determination whether he or she is an indispensable party [under section 389, subdivision (b)] [citation] . . . [Citation].  [¶]  If a necessary party cannot be joined, [section 389, subdivision (b) provides that] the court shall "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable." ' " (*Dreamweaver, supra,* 234 Cal.App.4th at p. 1173.)  To make that determination so, the court considers the following four factors: "(1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder." (§ 389, subd. (b).)

Of relevance here, "[b]ecause the sovereignty of federally recognized Indian tribes is limited primarily by federal law . . . states, including the State of California, have limited ability to interfere with commercial activity

12

on tribal land and California state courts have limited jurisdiction over tribes and entities that are considered arms of the tribes." (*Rincon Band of Luiseño Mission Indians v. Flynt* (2021) 70 Cal.App.5th 1059, 1087.) As a general rule, Indian tribes are immune from state court jurisdiction. (*Ibid.*; see also *Agua Caliente Band of Cahuilla Indians v. Superior Court* (2006) 40 Cal.4th 239 at pp. 247–248 ["The general rule still holds that although Indian tribes are not immune from lawsuits filed against them by the United States, the Indian tribes' sovereign status affords them immunity from state jurisdiction."].) " '[S]overeign immunity is not a discretionary doctrine that may be applied as a remedy depending on the equities of a given situation.' " (See, e.g., *Warburton/Buttner v. Superior Court* (2002) 103 Cal.App.4th 1170, 1182.) Rather, it presents a pure jurisdictional question. (*Ibid.*) But, a tribe may waive its sovereign immunity, so long as the waiver is unequivocally expressed. (*Ibid.*)

We review the trial court's ruling determining whether a party is necessary or indispensable under section 389 for an abuse of discretion. (*Pinto Lake MHP LLC v. County of Santa Cruz* (2020) 56 Cal.App.5th 1006, 1014; *Dreamweaver, supra,* 234 Cal.App.4th at p. 1173.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.) " 'To the extent that the district court's determination whether a party's interest is impaired involves a question of law, we review de novo.' " (*People ex rel Lungren v. Community Redevelopment Agency* (1997) 56 Cal.App.4th 868, 875 (*Lungren*).)

13

**B.** *Analysis: The Trial Court Erred by Dismissing the Petition Under Section 389*

Section 389, " 'as adopted in 1971, limits compulsory joinder to those situations where the absence of a person may result in substantial prejudice to that person or to the parties already before the court. [Citations.] As revised, this section conforms substantially to rule 19 of the Federal Rules of Civil Procedure and the cases relating to the federal rule are relevant.' " (*Lungren, supra* 56 Cal.App.4th at pp. 874–875.)

As the court in *Lungren* explained: "In its comments to the 1971 amendments of section 389 the Law Revision Commission noted that under the revised statute . . . a person is regarded as indispensable only in the conclusory sense that in his absence, the court has decided the action should be dismissed. Where the decision is to proceed the court has the power to make a legally binding adjudication between the parties properly before it. [¶] 'Section 389 formerly attempted not only to avoid prejudice to the parties or absent person but also to promote the general convenience of the courts by preventing a multiplicity of suits. As revised, Section 389 takes a different approach; it limits compulsory joinder to those situations where the absence of a person may result in substantial prejudice to that person or to the parties already before the court.' (Cal. Law Revision Com. com., 14 West's Ann. Code Civ. Proc., supra, § 389, p. 222.)" (*Lungren, supra,* 234 Cal.App.4th at p. 875.) Accordingly, the trial court has the power to make a judgment affecting a party's interests, even in that party's absence, where it is equitable to do so. (*Ibid.*)

In *Lungren*, the Attorney General challenged a decision by the Community Redevelopment Agency for the City of Palm Springs to transfer a piece of real property in downtown Palm Spring to the Agua Caliente Band of Cahuilla Indians so that they could operate a casino, in exchange for the tribe

14

returning a portion of the profits to the community. (*Lungren, supra,* at p. 870.) Much like the case at hand, the trial court dismissed the Attorney General's complaint after finding that the tribe was an indispensable party that could not be joined because of its sovereign immunity, and the Attorney General appealed. (*Id*. at p. 873.) The appellate court concluded that the trial court abused its discretion in granting the tribe's motion to dismiss and reversed the judgment of dismissal. (*Id*. at p. 885.) Appellants argue *Lungren* is controlling here. For the reasons we explain next, we agree.

### 1. Campo's Interests Are Adequately Represented by the Other Parties

Appellants assert that Campo is not a necessary party under section 389 because the other joined parties—Boulder Brush and the Board—have essentially the same interest in the litigation—upholding the approvals— and can therefore adequately represent Campo's interests in the litigation.[5]

As in *Lungren*, there is little doubt here that the "Tribe can claim an interest relating to the subject of the action." (*Lungren, supra,* 234 Cal.App.4th at p. 877.) "It is less clear, however, that the absence of the Tribe in the present action will, as a practical matter, impair or impede the

---

[5] Campo questions whether Appellants are challenging the trial court's order granting intervention under section 387. Appellants frame their arguments based on section 389 and we note that the trial court granted the motion for intervention *for the limited purpose* of filing the motion to dismiss under section 389. We therefore focus our analysis on the issue of whether dismissal was appropriate under section 389. Regardless, an order granting a non-party's motion to intervene pursuant to Code of Civil Procedure section 387 is not an independently appealable order and Appellants may seek review of that order on appeal from the judgment of dismissal. (*Taylor v. Western States Land & Mortgage Co.* (1944) 63 Cal.App.2d 401, 403.)

Tribe's ability to protect its interests." (*Ibid*.)  In *Lungren*, the appellate court acknowledged that the project—a casino on non-tribal land in Palm Springs—would "either proceed or not proceed depending on the outcome of the suit." (*Ibid*.)  Campo asserts that the same is true here, but in our view, the ability of the Tribe to go forward with the Campo Wind Project is not so closely tied to the present litigation.  The FEIR itself sets fourth four alternatives, only one of which is a "no [Boulder Brush Facility] project" alternative.  The other three contemplate the overall project proceeding in a different manner.  Notably, the second option expressly contemplates completing the Campo Wind Project without the use or development of any land over which the County has jurisdiction.  Thus, while it is apparent that approval of the Boulder Brush Facilities under the current proposal would allow Campo to monetize the proposed Campo Wind Facilities in a relatively expedient manner, the record before us at least suggests that it is not the *only* viable path.  Even if Appellants prevail in the present litigation, it would not necessarily be a death knell for the On-Reservation portion of the Campo Wind Project.

It is also important to note that, as in *Lungren*, "[t]he Tribe's ability to look after its own interests in this setting would be limited to the opportunity to argue that the [Board's] actions were permitted by California law." (*Lungren, supra,* 234 Cal.App.4th at p. 877.)  Here, the petition for writ of mandate challenges the Board's approval of the Off-Reservation Boulder Brush Facility based on CEQA and various planning and zoning regulations. As the FEIR makes clear, the Board considered the whole project, as they were required to do under CEQA, but the approvals that are the subject of the litigation impact only the Off-Reservation Boulder Brush Facility portion of the project, over which the County has jurisdiction.  Although the Tribe's

16

overall interest in the project as a whole may vary to some degree from the interests of Boulder Brush and the Board, when viewed through the lens of the petition, which defines the pending litigation, both the named parties and the Tribe share a nearly identical interest in the outcome of the litigation: upholding the Board's approval of the Boulder Bush Facility. (*Lungren,* at p. 877.)

As the FEIR explains, the primary purpose of the Boulder Brush Facility is to connect the Campo Wind Project, and one other smaller project, to the existing Sunrise Powerlink. Thus, while we acknowledge that the Tribe has a significant interest in whether the Boulder Brush Facility is allowed to proceed, we conclude that the contractor, Boulder Brush, has essentially the same interest in seeing that the approvals for that particular facility are upheld. Campo asserts that Boulder Brush's interests diverge from those of the Tribe because Boulder Brush could simply put their resources towards some other project. Notably, though, they do not identify any such alternate project. To the contrary, it is apparent that Boulder Brush has already invested in this project and the record reveals no indication that it has any intention of abandoning the project solely based on the present litigation. Indeed, any other similar project on non-tribal land in the state of California would likewise be subject to CEQA and would therefore at least run the risk of facing similar litigation hurdles.

At oral argument, Campo pressed this point, arguing that the interests in this case are different because Backcountry is primarily if not exclusively challenging the environmental effects of the wind turbine project on tribal land rather than those of the electrical facilities and transmission line on private land subject to the Country's jurisdiction. Backcountry disagrees, saying "it is indisputable that the [Boulder Brush p]roject is an enormous

17

industrial complex whose degradation of scenic resources on prominent ride lines visible for miles has 'significant' environmental impacts independent and apart from those of the Campo Wind Project."

To the extent Backcountry challenges the Bounder Brush project itself, the Tribe's interests are entirely derivative of and adequately represented by Boulder Brush. Again, as in *Lungren*, "a ruling in the present case would primarily address the scope of the [Board's] authority [over Off-Reservation land use] and only incidentally would adjudicate the interests of the Tribe in the [Boulder Brush Facility]. 'At the threshold, tribal immunity does not extend to barring suit against a third, non-immune party solely because the effect of a judgment against the third party will be felt by the tribe.' " (*Lungren, supra*, 234 Cal.App.4th at p. 879.) If we were to hold otherwise, a contractor proposing a project purely on private land under the jurisdiction of the County or the state could avoid CEQA, and other applicable state or local regulations, by simply involving a tribe in, for example, a nominal profit-sharing regime. We decline to create such a rule here and instead follow the court's analysis in *Lungren*. For these reasons, we conclude that the Tribe's contingent interest in the Boulder Brush Facility—which, as planned, will be entirely on Off-Reservation land under the jurisdiction of the County—is not sufficient on its own to make the Tribe a necessary party.

To the extent Backcountry will argue that the substation, switchyard and transmission line facilitates the Campo Wind Project, which itself has significant environmental impacts that should inform the County's decision whether to approve the Bounder Brush project, we likewise fail to see how the Tribe's interests are not at this juncture adequately represented by Boulder Brush. The purpose of the Boulder Brush project is to transmit energy generated by the Campo Wind Project. The economic interests of

18

Campo and Boulder Brush are firmly aligned. If at some point the Tribe believes the circumstances have changed such that its interests are no longer adequately represented by Boulder Brush, it can always renew its intervention request for the purpose of asserting that it has become an indispensable party.[6]

Campo asserts that neither the Board nor Boulder Brush are similarly situated because neither can claim sovereign immunity but, if that were the case, any time a tribe is a party to a contract or project, they would necessarily be an indispensable party, in contradiction to the holding in *Lungren.* (See *Lungren, supra,* 56 Cal.App.4th at p. 879; cf. *Southwest Center for Biological Diversity v. Babbitt* (9th Cir. 1998) 150 F.3d 1152, 1154 [declining to conclude that "a non-party is 'necessary' even though its interests are adequately represented on the underlying merits by an existing party, simply because that existing party has correctly concluded that it is an adequate representative of the non-party, and therefore opposes the non-party's preliminary motion to dismiss"].) Regardless, even if Campo's interests were not adequately represented by the Board or Boulder Brush, we would also conclude, as we explain next, that the factors set forth in section 389, subdivision (b) weigh against dismissal.

---

[6] The Tribe asserts that Boulder Brush is solely motivated by business judgment and its profit motive, whereas for Campo this is a matter of economic necessity. It suggests that at some point, Boulder Brush may lose interest in fighting a battle that the Tribe considers essential to its survival. Of course, nothing prevents the Tribe from assisting Boulder Brush, financially or otherwise, if it chooses to do so. In any event, such speculation about what *might* happen in the future cannot dictate the result on the present record.

## 2. The Factors Set Forth in Section 389 Weigh Against Dismissal

Appellants assert next that *Lungren* and other state law authorities "uniformly hold that where, as here, existing parties adequately represent the absent party's interest in defending the challenged approvals, dismissal on indispensability grounds will be denied." (See, e.g., *Lungren, supra,* 56 Cal.App.4th at pp. 884–885; *Deltakeeper v. Oakdale Irrigation Dist.* (2001) 94 Cal.App.4th 1092, 1109 [applying *Lungren* and concluding it would be inequitable to dismiss an action based on the inability to join a party with overlapping interests where doing so would allow the EIR to escape scrutiny]; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 162, 161 ["Even if the owner of the subject property was impaired in his ability to protect that interest, the owner was not indispensable" "because as a practical matter his ability to protect his interest was not impaired or impeded"].) Again, we agree.

The first factor to be considered when determining whether a party is not just necessary but indispensable, such that dismissal is appropriate under section 389, subdivision (b) is "to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties." "This is essentially the same assessment that must be made under subdivision (a) in determining whether a party's absence would impair or impede that party's ability to protect his or her interests, and determining whether proceeding to judgment would subject existing parties to inconsistent obligations." (*Lungren, supra,* 56 Cal.App.4th at p. 880.) For the reasons already articulated *ante*, we "conclude in the present case that the interest the public has in obtaining some level of review of the actions of the [Board] in [approving the Off-Reservation portion of the project under County land use jurisdiction] is sufficiently important that it provides an

20

exception to the general application of the rule, under section 389, that an action challenging a contract should be dismissed if a party to the contract cannot be joined as a party." (*Lungren,* at p. 882.)

The second factor is "the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided." (§ 389, subd. (b).) Here, Appellants seek injunctive relief and a peremptory writ of mandate directing the Board "to set aside and vacate its certification of the FEIR and adoption of the Project Approvals." This relief would necessarily impact Campo's ability to go forward with the Campo Wind Project as currently contemplated and we see no feasible way to lessen or avoid that impact. However, because the approval at issue is limited to the Boulder Brush Project, which is entirely Off-Reservation and on private land under the jurisdiction of the County, the impact is already limited by the scope of the Board and County's jurisdiction.[7] As discussed, *ante*, the Board has no jurisdiction over the On-Reservation portion of the project—the Campo Wind Project—and Campo may have available alternatives for proceeding even without the Boulder Brush Facility,

---

[7] At oral argument, counsel for Boulder Brush analogized the Boulder Brush facility to an extension cord, allowing the Tribe to plug the windmills on the reservation into the grid. That argument illustrates the fundamental point that neither the benefits nor the potential environmental impacts of the project are contained within the reservation. If the project were entirely on Tribal land for the sole benefit of the Tribe, there would be no need to plug the windmills into the grid *off* the reservation, and the remedy petitioners seek—review of the approvals for the Off-reservation Boulder Brush facility—would have no impact on the Tribe.

including, for example, "via a gen-tie route that extends across the [Manzanita] Reservation and [BLM] managed lands."

The third factor is "whether a judgment rendered in the person's absence will be adequate." (§ 389, subd. (b).) As in *Lungren*, here, "the judgment that could be rendered in the absence of the Tribe would be completely adequate." (*Lungren, supra,* 56 Cal.App.4th at p. 883.) The issue in the litigation is whether the Board's approval violated CEQA and other zoning and land use regulations. "Although it is undeniable that the Tribe would be affected by the outcome of the court's decision on the issue, the presence or absence of the Tribe would not appear to have any direct impact on resolution of the legal issues themselves." (*Lungren,* at p. 883.) Campo does not contend that a judgment rendered in its absence would be inadequate.

The fourth and final factor is "whether [Appellants] will have an adequate remedy if the action is dismissed for nonjoinder." (§ 389, subd. (b).) This factor weighs strongly in favor of allowing the litigation to proceed. If the petition is dismissed based solely on the inability to join the Tribe, there would be no avenue for Appellants, or any other interested party, to seek environmental review of the construction of a significant substation and associated gen-tie line and facilities on private, non-tribal land. And, of course, if Campo wants to participate in the litigation, they can do so by waiving their claim to sovereign immunity and seeking intervention not just for the purpose of dismissal.

"A court must consider fairness and equity in deciding whether a party is indispensable. A court has the power to proceed with a case even if indispensable parties are not joined. Courts must be careful to avoid converting a discretionary power or rule of fairness into an arbitrary and

22

burdensome requirement that may thwart rather than further justice." (*County of Imperial v. Superior Court* (2007) 152 Cal.App.4th 13, 26.) "In the CEQA context, '[t]he public has a right to insist on the adequacy of the environmental document upon which the agency makes its decision,' and courts should avoid thwarting this purpose through the harsh application of indispensable party rules." (*Ibid.*) On the record before us, it does not appear that the trial court adequately considered these equities when rendering its decision to dismiss Appellants' petition. For the reasons we have articulated, we conclude that although the outcome of the litigation necessarily impacts the Tribe, equity dictates that the trial court allow the petition to proceed, to ensure that the Off-Reservation portion of the project complies with California state environmental standards.

In reaching the opposite conclusion, the trial court relied almost exclusively on federal authority, and specifically one case, *Dine Citizens Against Ruining Our Environment v. Bureau of Indian Affairs* (9th Cir. 2019) 932 F.3d 843. That case—and the others that Campo refers to as a "wall of circuit authority" supporting dismissal—are readily distinguishable. In *Dine Citizens*, a "coalition of tribal, regional, and national conservation organizations ('Plaintiffs') sued the U.S. Department of the Interior, its Secretary, and several bureaus within the agency, challenging a variety of agency actions that reauthorized coal mining activities *on land reserved to the Navajo Nation*." (*Dine Citizens*, at p. 847, italics added.) There was no dispute that both the mine and the power plant at issue were entirely "on tribal land of the Navajo Nation," and therefore the court concluded that it was a matter of federal law, for Congress to address if it so chooses, that only the tribe " 'could seek review of an environmental impact statement covering significant federal action relating to leases or agreements for development of

23

natural resources on [that tribe's] lands.' " (*Id.* at pp. 848, 860−861.)[8]  The equities, and scope of jurisdiction, are undeniably different here, where the approvals concern a substation, switchyard and transmission line facilities that would be entirely *on private land* under the jurisdiction of the County and the Board.[9]

---

[8]    Although Campo does not develop its argument as to the other federal authorities it cites, they likewise address operations on tribal land.  (See *Kescoli v. Babbitt* (9th Cir. 1996) 101 F.3d 1304, 1307 [concerning mine complexes "located on the Navajo Nation's reservation"]; *Deschutes River Alliance v. Portland General Electric Company* (9th Cir. 2021) 1 F.4th 1153, 1156 [challenging approvals for a co-owned, co-operated hydroelectric project "partly within the Warm Springs Indian Reservation in Oregon"]; *Klamath Irrigation District v. United States Bureau of Reclamation* (9th Cir. 2022) 48 F.4th 934, 940 [concerning water rights to a the Klamath Basin subject to a treaty with the Klamath Tribes under which the tribes ceded their interest in millions of acres of land but retained rights to the basin and several tributaries].)

[9]    Because we reverse the judgment of dismissal based on section 389, we need not, and expressly do not address Appellants' argument that Public Resource Code section 21167.6.5, subdivision (d) pre-empts CEQA in this case.  (See, e.g., *Matrixx Initiatives, Inc. v. Doe* (2006) 138 Cal.App.4th 872, 881 [" 'In an emerging area of the law, we do well to tread carefully and exercise judicial restraint, deciding novel issues only when the circumstances require.' "])

## IV.  DISPOSITION

The judgment of dismissal is reversed and the matter is remanded to the superior court with directions to vacate the judgment of dismissal and the underlying order granting Campo's motion to dismiss, and to enter a new order denying the motion to dismiss.  Appellants are entitled to their costs on appeal.

KELETY, J.

WE CONCUR:


DATO, Acting P. J.


CASTILLO, J.